IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT SMITH, Individually, and on behalf of all others similarly situated, | ) ) ) |
| Plaintiffs, | ) Civil Action No.: 10 C 6574 ) |
| v. | ) Suzanne B. Conlon, Judge ) |
| SAFETY-KLEEN SYSTEMS, INC., | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

Robert Smith sued his employer, Safety-Kleen Systems, Inc., under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, alleging he was owed compensation for time spent showering and changing clothes. The lawsuit was conditionally certified as a collective action, and twelve other plaintiffs opted to join. Before the court are Safety-Kleen's motions for summary judgment and to decertify the collective action.

### I. Background

**A. Summary Judgment Standard**

Summary judgment is warranted if Safety-Kleen establishes the record evidence reveals no genuine issue of material fact and it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010). As the moving party, Safety-Kleen bears the initial burden of showing the absence of a genuine dispute before the burden shifts to plaintiffs to identify a dispute for trial. *Paul v. Theda Med. Ctr., Inc.*, 465 F.3d 790, 793–94 (7th Cir. 2006). All facts and reasonable inferences are construed in plaintiffs'

1

favor. *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 760 (7th Cir. 2008).

To assist the court in identifying factual disputes, N.D. Ill. Local Rule 56.1 sets forth a procedure for litigants to follow. The moving party is required to submit a statement of purported undisputed material facts with citations to the evidence supporting each statement. Loc. R. 56.1(a). The opposing party is required to respond to each purported undisputed material fact and if the opposing party disputes a fact, include "specific references to the affidavits, parts of the record, and other supporting materials relied upon" to show the dispute. *Id.* 56.1(b)(3)(B). A fact not properly disputed may be deemed admitted. *Id.* 56.1(b)(3)(C); *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630–31 (7th Cir. 2010). The opposing party may also submit additional facts to support the denial of summary judgment, "including references to the affidavits, parts of the record, and other supporting materials relied upon." Loc. R. 56.1(b)(3)(C).

Plaintiffs did not follow Local Rule 56.1. Rather than citing to evidence that disputes Safety-Kleen's submitted facts, plaintiffs cited to their own statement of facts, often citing to several paragraphs, making it difficult for the court to determine which parts were responsive to Safety-Kleen's fact. In addition, for their own additional statement of facts, plaintiffs frequently cited as support one of Safety-Kleen's facts, not evidence. Although the court has discretion to deem all of Safety-Kleen's facts admitted, the court will not do so. Instead, the court deems admitted all of Safety-Kleen's facts that plaintiffs' cited to as support for their additional statement of facts.[1] Additionally, the court disregards plaintiffs' additional facts that rely solely

---

[1] Those facts are: Def. Facts ¶¶ 1, 3, 9, 10, 12, 14, 17, 18–19, 20, 29, 31, 32, 35, 37.

on Safety-Kleen's facts without citation to evidence.[2] Finally, in some instances, plaintiffs did not support a dispute with any citation at all; those facts are deemed admitted.[3]

**B. Facts**

Safety-Kleen operates a recycle center in Dolton, Illinois, that processes and recycles chemical and solvent waste. Def. Facts ¶ 1. Plaintiffs work around hazardous chemicals and have the potential to be exposed to hazardous materials. Pl. Facts ¶ 3; Pl. Ex. A at SK001721. The range of tasks plaintiffs perform includes sampling tanks and drums containing toxic chemicals and solvents, loading and unloading containers of hazardous chemicals and solvents, pumping toxic chemicals from drums and containers, washing containers and drums, placing contaminated drums and containers in the shredder, spraying and washing hazardous chemicals off equipment, and performing maintenance and repair work on equipment. Pl. Facts ¶ 3. But not all plaintiffs perform the same duties, and plaintiffs do not identify which plaintiffs performed particular duties. Def. Reply to Pl. Facts ¶ 3.

Safety-Kleen has a written Personal Protective Equipment ("PPE") Management Program that plaintiffs are required to follow. Pl. Facts ¶ 6. The PPE available to plaintiffs includes Safety-Kleen uniforms, chemical protective polyethylene or Saranex coated coveralls, safety shoes, hard hats, safety glasses, chemical goggles, rubber boots, and an air purifying respirator. *Id.* ¶ 5. The PPE required depends on the tasks performed and materials handled. Def. Reply to Pl. Facts ¶ 6; Def. Reply Ex. F at SK000255–56. At a minimum, all employees must wear a uniform, gloves, leather or chemical-resistant steel-toed boots, safety glasses, and a hard hat.

---

[2] Those facts are: Pl. Facts ¶¶ 12–15, 27, 29.

[3] Those facts are: Def. Facts ¶¶ 23, 25, 34.

3

Def. Reply to Pl. Facts ¶ 7; Def. Reply Ex. G at SK000271.

The actual steps of the employees' pre- and post-shift routine are undisputed. In the morning after arriving at the facility, employees enter the employee locker room. Def. Facts ¶ 10. They enter the "clean" side, where each has a locker, and change from their street clothes into clean work pants and work shirts (the uniforms). *Id.* ¶ 12. Safety-Kleen provides the uniforms and launders them. *Id.* Plaintiffs are prohibited from taking uniforms off the site "to prevent any transference of any element from the site to any personal vehicle or home." Pl. Facts ¶ 9. The uniforms are ordinary work clothes, not made with specialized protective fabric.[4] Def. Facts ¶ 13. After the plaintiffs change into their uniforms, they walk through a turnstile to another locker on the "dirty" side of the locker room. *Id.* ¶ 14. There, they put on work boots and pick up hard hats and safety glasses, all kept in their dirty-side lockers. *Id.* In the winter, plaintiffs may also put on coveralls and jackets for warmth.[5] *Id.* ¶ 16. Then, employees take a small magnet from their dirty-side locker and place it on a magnetic board as they leave the locker room. *Id.* ¶ 17. The magnet designates which individuals are working at any particular time. *Id.*

---

[4] Plaintiffs attempt to dispute Safety-Kleen's assertion that the uniforms are made of ordinary material, but they do not properly dispute this fact, so it is deemed admitted. *See* Pl. Resp. to Def. Facts ¶ 13. To dispute the fact, plaintiffs cite to ¶¶ 4–10 of their statement of facts. None of those statements address the material of the uniforms.

[5] Plaintiffs characterize these coveralls as Saranex-coated, specialized to protect the wearer from chemicals. *See* Pl. Resp. to Def. Facts ¶ 16. Plaintiffs do not support this assertion with record evidence. They cite ¶¶ 4–10, 14 of their statement of facts. Only ¶ 14 concerns the type of coveralls provided, but that statement is insufficient, as discussed above. Safety-Kleen cites unrebutted evidence showing that plaintiffs confuse the two types of coveralls provided to employees. Def. Reply to Pl. Facts ¶ 14. One type is for warmth in the winter. The other is Tyvek-brand Saranex-coated coveralls, kept on the production floor and in the production office, used for task- and chemical-specific protection.

After leaving the locker room, plaintiffs walk to the production building, where the production office, break room, and time clock are located. Def. Facts ¶ 18. The production building is approximately 208 yards from the locker room. *Id.* ¶ 19.

The time clock is located on a wall in the area adjacent to the production office and break room. Def. Facts ¶ 20. Safety-Kleen rounds time punches to the nearest quarter hour for payroll purposes. Plaintiffs could not clock in after their scheduled start time but were allowed to clock in up to seven minutes early. *Id.*; Pl. Facts ¶ 17. Thus, the time punches were always rounded up to the start time. Pl. Facts ¶ 17. Plaintiffs who arrive at the time clock more than seven minutes before the start of their shifts wait or conduct other personal activities in the break room, adjacent to the time clock.[6] Def. Facts ¶ 21.

While working, plaintiffs may sometimes wear specialized protective equipment depending on their job for the day or the chemical being handled. Def. Facts ¶ 22. This specialized protective equipment includes neoprene gloves, a Tyvek suit, an apron, a face shield, or a respirator. *Id.* The respirators are stored either in plaintiffs' dirty-side lockers or in another locker in the production area. *Id.* ¶ 24. The rest of the specialized protective equipment is kept in the production office or is available from a supervisor. *Id.* ¶ 23. Plaintiffs generally put on and take off the specialized protective equipment while on the clock. *Id.* ¶ 25. The only exception, plaintiff Ramon Perez, wears his respirator a couple times a month while walking to the time clock when he encounters heavy fumes. *Id.* Other than this, plaintiffs are paid for time spent donning and doffing this task-specific specialized protective equipment. *Id.* ¶ 26.

---

[6] Plaintiffs attempt to dispute this fact by citing to ¶¶ 11–18, 38–39 of their statement of facts. *See* Pl. Resp. to Def. Facts ¶ 21. None of those statements address what activities early-arriving plaintiffs conduct.

5

Plaintiffs are provided a daily meal break, taken in the break room in the production office. Def. Facts ¶ 27; Pl. Facts ¶ 19. Hard hats, gloves, and other contaminated PPEs are not permitted in the break room and must be removed before entering. Pl. Facts ¶ 23. Plaintiffs do not identify PPE other than hard hats and safety glasses that were regularly removed before breaks. Def. Reply to Pl. Facts ¶ 23; Pl. Ex. T at 71–72. Plaintiffs were also required to wash their hands and faces before entering the break room. Pl. Ex. H at 115–16; Pl. Ex. J at SK00250; Pl. Ex. T at 71–72. The disputes over whether plaintiffs take a full 30-minute break for meals and whether the meal breaks are paid are discussed below.

At the end of their shift, plaintiffs clock out no more than fifteen minutes before their scheduled shift end. Def. Facts ¶ 28. After clocking out, plaintiffs walk 208 yards back to the employee locker room. *Id.* ¶ 29. After entering the locker room on the dirty side, they retrieve name magnets from the board and walk to their dirty-side lockers. *Id.* ¶ 31. At their dirty-side lockers, plaintiffs undress; place their boots, hard hats, and safety glasses in their lockers; and place their dirty uniforms in a laundry chute. *Id.* Plaintiffs then take mandatory showers. *Id.* ¶ 35; Pl. Facts ¶ 33. Safety-Kleen provides towels and soap, but plaintiffs may use personal toiletries if desired. Def. Facts ¶ 34. After showering, plaintiffs dry off, change back into their street clothes, and exit the locker room. *Id.* ¶ 37. Some plaintiffs also put on deodorant, cologne, or lotion before getting dressed. *Id.* Safety-Kleen adds 15 minutes a day to plaintiffs' time records for "shower time." *Id.* ¶ 38; Pl. Facts ¶ 34.

## II. Changing Clothes and Showering

### A. Compensability of Changing Clothes and Showering under the FLSA

Plaintiffs argue the time spent donning and doffing their Safety-Kleen-provided uniforms

6

and showering at the end of the day is compensable under the FLSA. Under this theory, the work day starts with the donning of the uniform, and the time spent walking to the production building and waiting to clock in must also be compensated under the continuous workday rule.

Safety-Kleen argues the donning and doffing of uniforms are classic preliminary and postliminary activities that are not compensable. Safety-Kleen seizes on the fact that the uniforms are ordinary work clothes, not specialized protective gear, and argues the FLSA requires compensation only for specialized protective gear. However, the law is not that clear-cut.

Activities that are preliminary or postliminary to an employee's principal activity are not required to be compensated under the FLSA. 29 U.S.C. § 254(a); *IBP, Inc. v. Alvarez*, 546 U.S. 21, 26–28 (2005). Section 254 specifically excludes preliminary or postliminary activities that would otherwise be "work" from the time the FLSA requires to be compensated. *Perez v. Mountaire Farms*, 650 F.3d 350, 363–64 (4th Cir. 2011). Whether changing clothes or showering is a non-compensable preliminary or postliminary act depends on whether those "activities are integral and indispensable to that employee's employment." *Musch v. Domtar Indus., Inc.*, 587 F.3d 857, 859 (7th Cir. 2009) (internal quotation marks omitted); *Steiner v. Mitchell*, 350 U.S. 247, 254–56 (1956). Showering "when performed under the conditions normally present" is a preliminary or postliminary activity. 29 C.F.R. § 790.7(g); *Musch*, 587 F.3d at 859. Whether changing clothes is compensable depends on whether an employee "cannot perform his principal activities without putting on certain clothes." 29 C.F.R. § 785.24(c). If changing clothes is "merely a convenience to the employee and not directly related to his principal activities," it is not compensable. *Id.*

7

Safety-Kleen's reliance on a categorical distinction between "ordinary" work clothes and "protective" gear is untenable. *Cf.* 29 C.F.R. § 790.7(b) ("No categorical list of 'preliminary' and 'postliminary' activities except those named in the act can be made, since activities which under one set of circumstances may be 'preliminary' or 'postliminary' activities, may under other conditions be 'principal' activities"); *Franklin v. Kellogg Co.*, 619 F.3d 604, 619–20 (6th Cir. 2010) (holding donning and doffing of mandatory uniforms integral and indispensable to principal activity at food processing plant). The focus is not on the type of clothing but on the reasons for wearing the clothing.

*Pirant v. U.S. Postal Service*, 542 F.3d 202 (7th Cir. 2008) is not to the contrary, but rather demonstrates one end of the spectrum of the relationship between an employee's principal activities and clothing. Pirant was a postal mail handler, and she sought credit under the FLSA for time spent putting on and taking off her gloves, shoes, and work shirt. *Id.* at 204, 208. The Seventh Circuit concluded those items were not integral and indispensable to Pirant's job because they were not "extensive and unique protective equipment" but rather "akin to . . . showering and changing clothes under normal conditions" not compensable under the FLSA.[7]

---

[7] *Pirant* could be read to support Safety-Kleen's argument because the Seventh Circuit distinguished Pirant's donning of a uniform shirt, gloves, and work shoes from the "unique protective clothing" that the Supreme Court required compensation for in *Steiner v. Mitchell*, 350 U.S. 247 (1956). *Pirant*, 542 F.3d at 208. However, *Pirant* also noted changing clothes was compensable in *Steiner* because "those activities were indispensable to the health and safety of the employees." *Id.* Indeed, the clothes the employees wore at work in *Steiner* appear to have been ordinary clothing, not special protective gear. *See Steiner*, 350 U.S. at 251 (describing employee-provided work clothes as "old but clean work clothes"); *Steiner v. Mitchell*, 215 F.2d 171, 174 (6th Cir. 1954) (appellate decision below describing clothes as "scrap clothing which [the] employees are free to sue [*sic*], if they choose, during working hours"); *see also Perez v. Mountaire Farms, Inc*, 650 F.3d 350, 367 (4th Cir. 2011) (declining to distinguish between specialized or generic protective gear because "[t]his distinction was not make in *Steiner*," in which the Supreme Court did not characterize the "old but clean work clothes" as "special").

*Id.* at 208–09 (internal quotation marks omitted). A mail handler's job cannot be compared to plaintiffs' jobs, in which they handle chemicals daily and have at least the potential for exposure to those chemicals. Instead, it is a job that plainly falls under "normal conditions."

Besides *Pirant*, the Seventh Circuit has addressed whether changing clothes is integral and indispensable to a job only on one other occasion. *See Musch v. Domtar Indus., Inc.*, 587 F.3d 857 (7th Cir. 2009). In *Musch*, the Seventh Circuit held plaintiffs' post-work shower and change of clothes (not required by the employer) was not integral and indispensable to plaintiffs' employment at a paper mill because there was no evidence "that chemical exposure is so pervasive that it requires these post-shift activities." *Id.* at 860–61. Instead, the evidence showed that on the occasion that a plaintiff was exposed to a hazardous chemical while working, he was instructed to remove any contaminated clothing and wash the affected areas, on the clock. *Id.* at 858–59. The chemical exposure was too infrequent to take the case out of the "normal conditions" that preclude FLSA compensation for showering and changing clothes.

This case differs from *Musch*. Plaintiffs are required by Safety-Kleen to change clothes and shower. But an activity that is required by an employer is not automatically integral and indispensable. *See, e.g., Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1344 (11th Cir. 2007) (considering factors "(1) whether the activity is required by the employer, (2) whether the activity is necessary for the employee to perform his or her duties, and (3) whether the activity primarily benefits the employer"); *Alvarez v. IBP, Inc.*, 339 F.3d 894, 902–03 (9th Cir. 2003) (requiring activity to be (1) necessary to employee's principal work and (2) done for the benefit

---

The court interprets *Pirant* as focusing not on the type of clothing but on the health and safety reasons for requiring the clothing.

of the employer), *affirmed on other grounds*, 546 U.S. 21 (2005) (this issue was not contested before the Supreme Court). An inquiry must still be made into the relationship between plaintiffs' principal job activities and the necessity of a shower and change of clothes. Safety-Kleen includes no information about plaintiffs' principal activities or the frequency of exposure to chemicals. Without this information, Safety-Kleen has not shown the absence of a material dispute for trial.[8]

**B. Meal Break and Shower Time**

Alternatively, Safety-Kleen argues any pre- or post-shift work that should be compensated is offset by the paid 30-minute meal break and the 15-minute credit for shower time. Paid meal breaks may offset unpaid compensable time if the meal times are not "work." *Barefield v. Vill. of Winnetka*, 81 F.3d 704, 710 (7th Cir. 1996). To be a *bona fide* meal time, "[t]he employee must be completely relieved from duty for the purposes of eating regular meals." 29 C.F.R. § 785.19(a). The Seventh Circuit uses the predominant benefit test to determine whether meal time is considered work time. *Id.*; *Alexander v. City of Chicago*, 994 F.2d 333, 337 (7th Cir. 1993). The predominant benefit test looks to who primarily benefits from the meal break, the employer or the employee. *See Alexander*, 994 F.2d at 337; *Hartsell v. Dr. Pepper Bottling Co. of Tex.*, 207 F.3d 269, 174 (5th Cir. 2000); *Roy v. County of Lexington*, 141 F.3d 533, 544 (4th Cir. 1998) (finding no conflict between predominant benefit test and "completely relieved from duty" requirement). However, because plaintiffs have identified a dispute

---

[8] Safety-Kleen's argument fails even under the narrower reading of *Steiner* in *Gorman v. Consolidated Edison Corp.*, 488 F.3d 586 (2d Cir. 2007). The Second Circuit restricts compensation for donning and doffing to workplaces with "dangers that transcend ordinary risks" such as "when work is done in a lethal atmosphere." *Id.* at 593. Safety-Kleen made no argument about the conditions at the recycle center.

regarding whether the meal breaks were paid for the entire statutory period (October 14, 2007 to October 14, 2010) and whether the meals were uninterrupted, summary judgement on this issue is inappropriate.

**1. Whether meal breaks were paid**

Because the statements of fact regarding whether lunch breaks are paid are disputed, the court relies on the cited evidence to determine whether a genuine issue exists.

It is clear from the record that as of September 2, 2007, meal breaks were paid. Def. Reply to Pl. Facts ¶ 19; Def. Reply Ex. W at SK001752. However, there is conflicting testimony about whether the meal breaks continued to be paid throughout the entire statutory period. Safety-Kleen identifies five plaintiffs who testified that the meal breaks were paid. *See* Def. Reply Ex. I 99–100 (Smith Dep.); Ex. B 92 (Hunter Dep.); Ex. C 144 (Marx Dep.); Ex. J 110 (Gunby Dep.); Ex. D 66 (Perez Dep.). But plaintiffs identify one who testified his meal breaks were not paid. Pl. Ex. Q. (Jones Dep.).

Furthermore, Derald Bogs, the Dolton plant manager until January 2010, testified that when he left, Safety-Kleen did not provide a paid lunch. Pl. Ex. G at 16–17. Safety-Kleen points to later in the deposition where Bogs could not remember the specifics about whether the lunch was paid or unpaid. Def. Reply to Pl. Facts ¶ 19; Def. Reply Ex. Q at 51–53. His later statements do not directly contradict his earlier testimony, and at summary judgment the court cannot accept his later equivocations over his earlier statements. The testimony of Ken Brozak, another member of management, does not clear up the dispute. Although he testified that at the time of the deposition, Safety-Kleen provided paid meal breaks, he also stated that at some point in the past four years, there may have been unpaid meal breaks. Def. Reply Ex. P at 42–43.

11

In addition, Safety-Kleen's company-wide "Time Recording and Approvals Policy," dated Sept. 1, 2009, suggests lunchtime was unpaid. Pl. Ex. S at SK000169. The policy requires employees to punch in and out at meal times and specifically notes that if an employee is asked to work during lunch, the employee will be paid. *Id.* If the local Dolton facility had a different written policy, Safety-Kleen has not provided it.

Safety-Kleen asks this court to credit the testimony of the plaintiffs who stated their meal breaks were paid. But taking the evidence in a light most favorable to plaintiffs, there is a genuine dispute about whether meal time was paid throughout the entire statutory period.

**2. Whether meal breaks were uninterrupted**

There is also a genuine issue of fact regarding whether meal breaks were uninterrupted. Plaintiffs contend their meal breaks were often interrupted by co-workers or supervisors to address work-related matters. Pl. Facts ¶¶ 25–26. As evidence, they note one plaintiff testified that maybe once a year, a live tanker would come in that needed to be done right away, and he would work during his lunch break. Pl. Ex. D at 93–94 (Hunter Dep.). Occasionally, he started his lunch five or ten minutes late if he had to finish a task. *Id.* at 94. Regularly, but not every day, he received calls during lunch on his radio about a tanker coming in. *Id.* He responded to the call to give instructions where to leave the tanker, but did not otherwise stop his lunch. *Id.* Another plaintiff testified that, as a lead, once or twice a month he would shorten his lunch hour by 10 or 15 minutes to finish or start offloading a live load. Pl. Ex. U at 145 (Marx Dep.). He stated that others would have to cut their lunches short to deal with time-sensitive matters once a month or once every couple of months. *Id.* at 150–56.

Safety-Kleen argues the interruptions were so infrequent that the interruptions should not

12

affect whether the meals are *bona fide*. Additionally, they cite to a third plaintiff who testified that besides taking a couple minutes to wash his hands, his meal breaks were not interrupted. Def. Reply Ex. K at 98–99 (Ross Dep.).

An occasional interruption would not necessarily preclude a meal period from being *bona fide*. However, the record does not allow the court as a matter of law to conclude the meal periods are only occasionally interrupted, especially because Safety-Kleen has not addressed whether it allows employees to make up missed meal times. *Cf. Avery v. City of Talladega*, 24 F.3d 1337, 1347 (11th Cir. 1994) (concluding plaintiffs' meal periods were *bona fide*, but noting that when plaintiffs are occasionally recalled to active service during meals or denied meal breaks, they are entitled to be compensated for that time). The record is unclear whether at meal times plaintiffs "are free to spend their meal breaks in any way they wish," *id.*, or whether they are required to be on call and stop lunch at any point, *cf. Bernard v. IBP, Inc. of Neb.*, 154 F.3d 259, 265 (5th Cir. 1998) (lunch break primarily for benefit of employer where maintenance workers had to wear radios and tools, could not leave the premises, and were often interrupted by maintenance problems that required immediate attention).

## C. Conclusion

Summary judgment is denied as to plaintiffs' donning and doffing claims because genuine issues of material fact exist. Safety-Kleen did not address plaintiffs' principal job activities or the necessity of changing clothes and showering. Furthermore, there is a dispute concerning whether the meal breaks were paid during the entire statutory period and whether the meal breaks are *bona fide*. Accordingly, the court need not address Safety-Kleen's purported video evidence.

### III. Time Rounding

As an alternative reason for denying Safety-Kleen's summary judgment motion, plaintiffs contend Safety-Kleen's time-rounding practices violate the FLSA. Safety-Kleen argues this is a new theory of liability that was not included in the complaint and cannot be raised for the first time in a summary judgment response. Safety-Kleen is correct that this theory of liability was not included in the complaint and, generally, new claims cannot be raised for the first time at summary judgment. *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996). However, it is possible for parties to impliedly consent to a constructive amendment of the complaint in the course of a case. *See Hutchins v. Clarke*, 661 F.3d 947, 957 (7th Cir. 2011). To determine consent, the court looks at "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *Id.* (internal citations omitted). This is a close issue. Plaintiffs have mentioned the rounding issue in previous filings with the court. *See* Dkt. No. 24 at pp. 3–4 (motion to certify class). And defendants responded to the argument, albeit in a footnote. *See* Dkt. No. 28 at p. 5 n.2 (defendant's opposition to certification). But the court declines to find that Safety-Kleen consented to the amendment. Safety-Kleen objected to the argument in its summary judgment reply as an improper amendment to the complaint, and plaintiffs have not moved to amend their complaint or otherwise respond.

### IV. Safety-Kleen's Motion to Decertify the Collective Action

In the event this court denies Safety-Kleen's summary judgment motion, Safety-Kleen moves to decertify the collective action. Whether an FLSA lawsuit should proceed as a collective action involves two steps. The first step, which occurs at the beginning of a lawsuit,

14

requires only a minimal showing that potential class members are similarly situated. *See Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 847–48 (N.D. Ill. 2008) (Castillo, J.). After discovery, plaintiffs must satisfy a more stringent burden to show the named plaintiff and the opt-in plaintiffs are similarly situated enough to allow the collective action to proceed. *Russell v. Ill. Bell Tel. Co.*, 721 F. Supp. 2d 804, 811 (N.D. Ill. 2010) (Kennelly, J.). Some factors courts consider are (1) the plaintiffs' employment settings, (2) whether different affirmative defenses are applicable to different plaintiffs, and (3) fairness and procedural concerns. *Id.*

Decertification of the collective action is warranted at this point in the litigation. The key issues to this case are (1) whether plaintiffs' principal activities necessitate changing clothes and showering, (2) whether the meal breaks are paid, and (3) whether the meal breaks are uninterrupted. Plaintiffs rely primarily on the fact that all plaintiffs are subject to the same uniform, PPE, and showering policies to argue the opt-in plaintiffs are similarly situated to the named plaintiff. But they do not adequately establish the named plaintiff has similar job duties to the opt-in plaintiffs. Instead, plaintiffs lump together the job duties of each plaintiff and assert every plaintiff performs every duty. *See* Pl. Opp. to Def. M. to Decertify at 2–3. As Safety-Kleen notes in its reply, plaintiffs have different job duties. One plaintiff's job was to use a forklift to take hoppers of metal to the ring mill, which cleans and processes metal for recycling. Def. Decert. Reply Ex. A at 64–65 (Jones Dep.). Two plaintiffs worked in the control room, separated from the chemicals for at least part of the day. Def. Decert. Reply Ex. B at 21–22 (Ross Dep.), Ex. C (Marx Dep.). Another plaintiff monitored the "LUWA" machines that distill chemicals. Def. Decert. Reply Ex. D at 12–13 (Perez Dep.). Plaintiffs have made no showing that these various job duties are similarly situated to the named plaintiff's job duties or even set

15

forth exactly what the named plaintiff's job duties are. Nor have plaintiffs presented evidence that the environment at the recycle center was so toxic that *all* employees, regardless of job duties, must change clothes and shower.

Moreover, plaintiffs have made no showing that all plaintiffs are similarly situated in terms of whether their meal breaks are interrupted. The evidence at summary judgment showed a dispute about whether meal breaks were uninterrupted. One plaintiff testified his meal break was not interrupted, but another plaintiff, who was a lead worker, testified his meal break was interrupted at times. This dispute precluded summary judgment, but also suggests lead workers may have different meal-time responsibility than ordinary workers. This unaddressed situation renders a collective action inappropriate for this case.

## V. Conclusion

Safety-Kleen's summary judgment motion is denied, but its motion for decertification is granted. The case proceeds as to named plaintiff Robert Smith. The remaining opt-in plaintiffs are dismissed without prejudice.

ENTER:

January 18, 2012

Suzanne B. Conlon
United States District Judge